Present:  All the Justices

GORDONSVILLE ENERGY, L.P.

v.  Record No. 980813  OPINION BY JUSTICE BARBARA MILANO KEENAN
                                    February 26, 1999
VIRGINIA ELECTRIC AND
POWER COMPANY

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Randall G. Johnson, Judge

In this appeal, we determine whether the terms of a contract between Virginia Electric and Power Company (Virginia Power) and Gordonsville Energy, L.P. (Gordonsville) entitle Virginia Power to recover liquidated damages for an 11-day period in which Gordonsville's electric power plant was "shut down" due to a mechanical failure.

Under the parties' "Power Purchase and Operating Agreement" (the Contract), Gordonsville agreed to build a $200 million electric power facility capable of producing electricity for sale exclusively to Virginia Power.  The Gordonsville facility consists of two identical electric generating plants, designated as Unit 1 and Unit 2.  The outage at issue in this dispute involves Unit 1.

Article 8 of the Contract, entitled "Interconnection," provides in § 8.2 that Gordonsville "shall be responsible for the design, construction, installation, maintenance and ownership of the Facility."  "The Facility" is defined as including "all energy producing equipment."

The Gordonsville facility began operating in June 1994. When Virginia Power requires electricity from Gordonsville, Virginia Power "dispatches" Gordonsville by notifying it of the number of kilowatts required. Gordonsville responds by producing the electricity and supplying it to Virginia Power's distribution system. Since the Gordonsville facility went into service in 1994, Virginia Power has "dispatched" Gordonsville only about 15 to 20 percent of the time. A typical dispatch of the Gordonsville facility lasts four to six hours.

Virginia Power makes two types of payments to Gordonsville under the Contract. The first type is made for Gordonsville's "Net Electrical Output," or the net amount of kilowatt hours of electricity actually delivered by Gordonsville to Virginia Power. This payment amount varies from month to month.

The second type of payment, termed "Capacity Payments," is a fixed monthly payment for Gordonsville's "Dependable Capacity," which represents the amount of electricity available for dispatch at Virginia Power's request from the Gordonsville facility. The Capacity Payments were designed to compensate Gordonsville for the costs incurred in building its facility, as well as the fixed costs related to operating and maintaining the facility. At the time this dispute arose, Virginia Power was obligated under the Contract to make Capacity Payments of about

2

$1.2 million per month, or $40,000 per day, for each of the two units in the Gordonsville facility.

The Contract defines two types of "outages" that may occur when either unit of Gordonsville's facility is unavailable for a potential dispatch request from Virginia Power. A "Scheduled Outage" is a planned interruption in the operation of a unit of the facility that has been coordinated in advance with Virginia Power for the purpose of conducting inspections or routine maintenance. During Scheduled Outages, Virginia Power remains obligated to make Capacity Payments to Gordonsville.

A "Forced Outage" is defined in § 1.18 of the Contract as "[a]n occurrence where: (i) any or all of [a unit's] Dependable Capacity is not available for Dispatch; or (ii) [a unit's] delivery of Net Electrical Output deviates from Virginia Power's Dispatch level by greater than ±5%." Section 1.20 defines a "Forced Outage Day" as "[a] continuous twenty-four (24) hour period (a) beginning with the start of a Forced Outage, regardless of the number of actual outages that may occur during such twenty-four (24) hour period(s), and (b) designated by [Gordonsville] as a Forced Outage Day."

A "Force Majeure Day" is defined in § 1.19 as "a Forced Outage Day that is both (i) excused under the provisions of Article 14 and (ii) . . . designated as a Force Majeure Day by

3

[Gordonsville]."  Section 14.1 of the Contract provides, in relevant part:

> [N]either Party shall be responsible or liable for or deemed in breach hereof because of any delay or failure in the performance of their respective obligations hereunder to the extent that such delay or failure is <u>due solely to circumstances beyond the reasonable control of the Party experiencing such delay or failure, including but not limited to</u> acts of God; unusually severe weather conditions; strikes or other labor difficulties; war; riots; requirements, actions or failures to act on the part of governmental authorities preventing performance; inability despite due diligence to obtain, maintain or renew required licenses; accident; fire; <u>damage to or breakdown of power generation materials and equipment that is not caused by normal wear and tear</u>; or transportation delays or accidents. (Emphasis added.)

Under the Contract, Gordonsville is allowed a specified number of Forced Outage Days during the facility's initial six months of operation and for each one-year period thereafter throughout the 30-year term of the Contract.  The Contract further provides in § 10.18:

> The Parties agree that Virginia Power will be substantially damaged in amounts that will be difficult or impossible to determine if . . . the Facility exceeds the allowance for Forced Outage Days . . .  Therefore, . . . the Parties have agreed on sums which the Parties agree are reasonable as liquidated damages for such occurrences.  It is further understood and agreed that the payment of the liquidated damages is in lieu of actual damages for such occurrences.  [Gordonsville] hereby waives any defense as to the validity of any liquidated damages stated in this Agreement as they may appear on the grounds that such liquidated damages are void as penalties or are not reasonably related to actual damages.

4

For each Forced Outage Day in excess of the allowed number, § 10.15 of the Contract directs that Virginia Power's Capacity Payments will be reduced by $600,000 per day as liquidated damages. The Contract also states that this liquidated damages provision does not apply if a Forced Outage Day qualifies as a Force Majeure Day. However, the Contract relieves Virginia Power of its obligation to make Capacity Payments to Gordonsville for such Force Majeure Days.

In September 1995, while Unit 1 was operating under a dispatch from Virginia Power, an alarm indicated an electrical short circuit inside the Unit's 100-ton steam turbine generator. The generator had been manufactured for Gordonsville by General Electric Company (General Electric), one of two manufacturers of that type generator in the United States. Gordonsville personnel performed tests on the generator for several days, but were not able to determine the cause of the short circuit. On September 9, 1995, Kenneth Nieman, the executive director of the Gordonsville facility, decided to "shut down" Unit 1 and "take it off line" so that the generator problem could be diagnosed and repaired. On September 12, 1995, Gordonsville notified Virginia Power that Unit 1 was experiencing an event of Force Majeure and was unavailable for dispatch until further notice. Personnel from General Electric and Gordonsville disassembled

5

the generator and shipped its 17-ton rotor to a General Electric facility in Richmond, where it was determined that a copper "pole-to-pole" connector inside the rotor had failed. Unit 1 was returned to service on September 20, 1995, 11 days after it had been "shut down."

Virginia Power concluded that the 11 outage days in September 1995, did not qualify as Force Majeure Days and informed Gordonsville that, for this reason, those days constituted unexcused Forced Outage Days under the Contract. Virginia Power also informed Gordonsville that it previously had exhausted its allowance of Forced Outage Days. Virginia Power asserted a claim against Gordonsville for a total of $6.6 million in liquidated damages under the Contract for the 11-day period, and began withholding $600,000 per month from its payments to Gordonsville.

Gordonsville filed a motion for judgment against Virginia Power in the trial court, alleging breach of contract based on Virginia Power's "wrongful assessment of liquidated damages" as a result of the September 1995 outage. In Count I, Gordonsville alleged that all 11 days of the September 1995 outage were Force Majeure Days and that, therefore, Virginia Power was not entitled to liquidated damages. Gordonsville alleged in the alternative in Count II that even if the September 1995 outage did not result from a Force Majeure event, Gordonsville was

6

entitled to count three of the outage days as allowed Forced Outage Days.  Thus, Gordonsville alleged that Virginia Power was not entitled to $1.8 million of the $6.6 million claimed in liquidated damages.  In Count V, Gordonsville essentially alleged that the liquidated damages clause of the Contract was an unenforceable penalty.[1]

The trial court sustained Virginia Power's demurrer and plea of *res judicata* or collateral estoppel addressed to Count V, holding that it was bound by its ruling on the same issue in an earlier action between the parties, which arose from two unrelated outages at the Gordonsville facility in June-July 1994, and February 1995.  In that earlier action, the court had ruled that the liquidated damages provision of the Contract was not an unenforceable penalty.

The trial court ruled in the alternative that even if this issue was not barred by *res judicata* or collateral estoppel, Virginia Power was entitled to summary judgment on Count V. Based on its assumption that the evidence in the pending case concerning the liquidated damages clause would not differ from the evidence presented in the prior action, the court awarded summary judgment for Virginia Power on Count V for "reasons of judicial economy," but permitted Gordonsville to submit a

---

[1]Gordonsville alleged two other Counts in its motion for judgment that are not at issue on appeal.

written offer of proof for the court's consideration.  Following Gordonsville's submission of the offer of proof, the trial court entered an order affirming its award of summary judgment for Virginia Power on Count V.

The trial court then considered the parties' cross motions for summary judgment on Count II.  In the prior action between the parties, the jury had found that the June-July 1994 and February 1995 outages were caused by Force Majeure events.  Gordonsville argued that because of that finding, those outage days could not be counted toward the number of Forced Outage Days allowed under the Contract.  Gordonsville argued, therefore, that it still had three allowed Forced Outage Days available to be applied to the September 1995 outage.  The trial court ruled that although the earlier 1994 and 1995 outage days constituted Force Majeure Days, they also constituted Forced Outage Days under the terms of the Contract, and that these outage days must be counted in computing Gordonsville's allowed number of Forced Outage Days.  The trial court awarded summary judgment for Virginia Power on Count II.

The claims asserted in Count I were tried before a jury. Thomas Butler, who qualified as an expert in mechanical engineering, testified that the pole-to-pole connector in the generator rotor of Unit 1 failed because it had been improperly brazed, or soldered, during its manufacture and assembly.

8

Butler further testified that the connector did not fail due to normal wear and tear, and that there was nothing Gordonsville "could [have] or should have done" to prevent failure of the connector.

Robert Hamilton, a retired mechanical engineer who had worked for General Electric for about 36 years, also testified as an expert witness. He explained that the General Electric workers who manufactured and assembled the pole-to-pole connector used in the Gordonsville generator were required to follow detailed drawings. In essence, Hamilton testified that one of the drawings contained a mistake and deviated from the actual design requirements because the drawing showed a rigid, brazed piece, rather than a flexible piece, extending into an area of the connector. Hamilton concluded that the Gordonsville generator failed due to the inability of the defective pole-to-pole connector to withstand normal wear and tear. He further testified that a properly manufactured pole-to-pole connector should not wear out, but should "last forever." In Hamilton's opinion, if the Gordonsville pole-to-pole connector had been manufactured in accordance with General Electric's own design requirements, the generator failure would not have occurred.

In contrast to Hamilton's testimony, Robert Fenton, a retired electrical engineer who was formerly a general manager of generator design and engineering at General Electric,

testified that there was nothing General Electric could have done differently that would have prevented the failure of the pole-to-pole connector in Gordonsville's generator. In Fenton's opinion, the failure of the Gordonsville generator was a "random, unexpected failure."

Over Gordonsville's objection, the trial court gave the jury Instruction No. 10, which stated:

> Gordonsville Energy is responsible to Virginia Power under the parties' contract for the design and construction of Gordonsville Energy's electric generating facility, including the steam turbine generator, its rotor and the rotor's component parts that failed in September, 1995. Although Gordonsville Energy relied on General Electric Company to design and construct the rotor, Gordonsville Energy is responsible to Virginia Power for General Electric's performance of those activities just as if Gordonsville Energy had performed them itself.

The jury returned its verdict in favor of Virginia Power, finding that "the [September 1995] outage was not a *force majeure* event." The trial court entered final judgment in favor of Virginia Power, and this appeal followed.

Gordonsville first argues that the trial court erred in granting Instruction No. 10 because the instruction improperly directed the jury to impute to Gordonsville any act of negligence by General Electric. Gordonsville also asserts that, as a matter of law, the outage in September 1995 was a Force Majeure event under the terms of the Contract because there was

10

no evidence of negligence by Gordonsville.  Thus, it contends that the jury was required by the evidence to find that the September 1995 outage was "beyond the control" of Gordonsville and resulted in Force Majeure Days under the Contract.  We disagree with Gordonsville's arguments.

In granting Instruction No. 10, the trial court ruled that the Contract did not excuse Gordonsville's failure to perform under the Contract if the failure was caused by the negligence of a subcontractor retained by Gordonsville to perform functions for which Gordonsville was responsible.  Under familiar principles of contract interpretation, we reach the same conclusion and hold that the trial court did not err in granting Instruction No. 10.

It is the duty of the court, not the jury, to interpret a contract when its terms are clear and unambiguous.  <u>D.C. McClain, Inc. v. Arlington County</u>, 249 Va. 131, 135, 452 S.E.2d 659, 662 (1995); <u>Winn v. Aleda Const. Co.</u>, 227 Va. 304, 307, 315 S.E.2d 193, 194 (1984).  The court must interpret the contract as a whole to determine the parties' intent.  <u>Westmoreland-LG&E Partners v. Virginia Elec. and Power Co.</u>, 254 Va. 1, 11, 486 S.E.2d 289, 294 (1997).  Since the interpretation of plain and unambiguous terms of a contract is a question of law, we are not bound by the trial court's determination and are afforded the same opportunity as the trial court to review the contract

11

provisions.  C.F. Garcia Enterprises, Inc. v. Enterprise Ford

Tractor, Inc., 253 Va. 104, 107, 480 S.E.2d 497, 498-99 (1997);

Tuomala v. Regent Univ., 252 Va. 368, 374, 477 S.E.2d 501, 505

(1996); Langman v. Alumni Ass'n of the Univ. of Va., 247 Va.

491, 498, 442 S.E.2d 669, 674 (1994).

In § 8.2 of the Contract, the parties agreed, in plain and unambiguous language, that Gordonsville was "responsible for the design, construction [and] installation" of the Facility, which is defined in § 1.16 of the Contract as "all energy producing equipment."  In a later section of the Contract, § 14.1, the parties agreed that an outage would be excused if it was "due solely to circumstances beyond [Gordonsville's] reasonable control . . . including . . . damage to or breakdown of power generation materials and equipment that is not caused by normal wear and tear."

The provisions of § 14.1 do not override or alter the allocation of responsibilities set out in § 8.2.  By its plain terms, § 14.1 does not purport to address the duties of parties to the Contract.  Instead, that section addresses the circumstances under which the failure of performance of contractual duties will be excused as Force Majeure days.  Thus, under the Contract, Gordonsville remained responsible for the contractual obligations it subcontracted to General Electric and was excused from performance only if an outage also was "beyond

12

the reasonable control" of any subcontractors hired to perform Gordonsville's duties set forth in § 8.2.

The evidence did not establish as a matter of law that the September 1995 outage was beyond Gordonsville's reasonable control.  The evidence showed that the failure of the pole-to-pole connector was either a random, unexpected occurrence or the result of negligence by General Electric.  In returning its verdict in favor of Virginia Power, the jury necessarily rejected the proposition that the failure was a random, unexpected occurrence.

Gordonsville next contends that the trial court erred in holding that the Force Majeure Days from the previous 1994 and 1995 outages should be counted against Gordonsville's allowance of Forced Outage Days.  Gordonsville argues that summary judgment on Count II should have been entered in its favor, because a Force Majeure day is an excused "Forced Outage Day" for which Gordonsville merely loses its Capacity Payment under § 10.15 of the Contract.

In response, Virginia Power argues that the Contract specifically designates Force Majeure Days as Forced Outage Days.  Thus, Virginia Power contends that the trial court properly concluded that the earlier Force Majeure Days had to be included in Gordonsville's allotment of Forced Outage Days.  We

disagree and hold that the trial court erred in granting summary judgment in favor of Virginia Power on Count II.

As the trial court correctly noted, § 1.19 of the Contract defines a Force Majeure Day as "a Forced Outage Day that is . . . excused under the provisions of Article 14."  When contract terms are clear and unambiguous, the words used by the parties must be given their plain and ordinary meanings.  Hutter v. Heilmann, 252 Va. 227, 231, 475 S.E.2d 267, 270 (1996); Marina Shores, Ltd. v. Cohn-Phillips, Ltd., 246 Va. 222, 225-26, 435 S.E.2d 136, 138 (1993).  In the context of the Contract provisions, the usual and customary meaning of the term "excuse" is "to grant [an] exemption . . . to or from."  Webster's Third New International Dictionary 794 (1993).  The Contract only limits the scope of the exemption for Force Majeure Days by eliminating the Capacity Payment of about $40,000 to Gordonsville for each such day.[2]  Since the Contract does not otherwise limit the exemption provided for Force Majeure Days, such days are excused, or exempted, under the Contract from being counted toward the number of allowed Forced Outage Days.

This conclusion also is supported by the plain language of § 14.4, which provides that "each Day of a Forced Outage excused under this Article 14 shall be considered a Forced Outage Day

_____

[2]This limitation of exemption is contained in § 10.15(b)

14

unless [Gordonsville] appropriately designates such Day as a Force Majeure Day."  This language compels the conclusion that a day that _is_ appropriately designated as a Force Majeure Day and is excused under Article 14 is not "considered a Forced Outage Day" under the terms of the Contract.  Thus, the trial court erred in ruling that the earlier 1994 and 1995 Force Majeure Days were Forced Outage Days chargeable to Gordonsville in computing the number of Forced Outage Days allowed under the Contract.  Therefore, we conclude that the trial court erred in awarding summary judgment for Virginia Power on Count II and in failing to award summary judgment for Gordonsville on that Count.[3]

Finally, Gordonsville argues that the trial court erred in dismissing Count V of the motion for judgment because Gordonsville's offer of proof established that the liquidated damages clause of the Contract constituted an unenforceable penalty.  Virginia Power responds, in part, that Gordonsville is

_____

of the Contract.

[3]Virginia Power argues on appeal that an additional, independent basis exists for affirming the trial court's award of summary judgment in its favor on Count II.  Virginia Power argues that Gordonsville's motion for judgment alleged that the _last_ three days of the September 1995 outage should be counted as allowed Forced Outage Days, when Gordonsville should have alleged that the _first_ three days of the outage were allowed.  Since this claim was not raised before the trial court, we will not address it for the first time on appeal.  See Rule 5:25.

15

barred from contesting the reasonableness of the liquidated

damages clause since it waived in the Contract the right to

raise such an objection.[4]

The Contract provides in § 10.18 that Gordonsville "waives

any defense as to the validity of any liquidated damages stated

in this Agreement as they may appear on the grounds that such

liquidated damages are void as penalties or are not reasonably

related to actual damages."  Nevertheless, Gordonsville argues

that it should be relieved from this contractual obligation

because such a waiver violates public policy.  We disagree with

Gordonsville's argument.

This Court has recognized that a liquidated damages

provision may constitute a penalty and, therefore, be

unenforceable when the amount agreed to is "out of all

proportion to the probable loss."  Brooks v. Bankson, 248 Va.

197, 208, 445 S.E.2d 473, 479 (1994); Taylor v. Sanders, 233 Va.

73, 75, 353 S.E.2d 745, 746-47 (1987).  Such a provision also

may constitute an unenforceable penalty if the agreed amount is

---

[4]We find no merit in Gordonsville's contention that Virginia Power is procedurally barred from asserting that Gordonsville waived its objection to the Contract's liquidated damages provision, because Virginia Power did not assign cross-error to an alleged ruling by the trial court that the waiver was unenforceable.  The trial court did not rule on this issue in this action and did not expressly adopt such a ruling from the earlier action.  Thus, an assignment of cross-error was not required under Rule 5:18.

16

"grossly in excess of actual damages." O'Brian v. Langley School, 256 Va. 547, 551, 507 S.E.2d 363, 365 (1998). However, it is equally well-settled that a term of the parties' contract becomes the law of the case unless such term is repugnant to public policy or to some rule of law. Rash v. Hilb, Rogal & Hamilton Co. of Richmond, 251 Va. 281, 285, 467 S.E.2d 791, 794 (1996); D.C. McClain, Inc., 249 Va. at 135, 452 S.E.2d at 662.

We decline to hold that Gordonsville's contractual waiver of the right to object to a liquidated damages clause is "repugnant to public policy." We long have recognized that a party may enter into an agreement in which he waives a significant right. See e.g., Blue Cross of Southwestern Va. v. McDevitt & Street Co., 234 Va. 191, 196-97, 360 S.E.2d 825, 828 (1987) (waiver of right to claim damages); Flintkote Co. v. W.W. Wilkinson, Inc., 220 Va. 564, 570, 260 S.E.2d 229, 232 (1979) (waiver of right to jury trial on amount of attorney's fees); VNB Mortgage Corp. v. Lone Star Indus., Inc., 215 Va. 366, 369, 209 S.E.2d 909, 912 (1974) (waiver of right to file mechanic's lien).

Generally, a party may waive by contract any right conferred by law or contract. See Roenke v. Virginia Farm Bureau Mut. Ins. Co., 209 Va. 128, 135, 161 S.E.2d 704, 709 (1968); Woodmen of the World Life Ins. Soc. v. Grant, 185 Va. 288, 299, 38 S.E.2d 450, 454 (1946). If the party being charged

17

with relinquishment of a right had knowledge of the right and intended to waive it, the waiver will be enforced. Roenke, 209 Va. at 135, 161 S.E.2d at 709; Woodmen, 185 Va. at 299, 38 S.E.2d at 454.

Gordonsville raised no allegation at trial and presented no evidence that it entered into § 10.18 of the Contract under duress, or as the result of fraud or mistake, or under any other circumstances that might serve as a basis for declaring the waiver unenforceable. Instead, the evidence at trial established that the entire Contract resulted from extended, "arms-length" negotiations between two sophisticated corporate entities, both represented by counsel. Therefore, we conclude that Gordonsville's contractual waiver is enforceable and bars its claims alleged in Count V.[5]

For these reasons, we will affirm the trial court's judgment in favor of Virginia Power on Counts I and V. We will also reverse the trial court's judgment on Count II and enter final judgment in favor of Gordonsville on that Count.

Affirmed in part,
reversed in part,
and final judgment.

---

[5]Since Gordonsville waived any objection to the reasonableness of the liquidated damages clause, we do not address Gordonsville's assignment of error concerning the trial court's application of *res judicata* or collateral estoppel to bar relitigation of the validity of the liquidated damages provision.